# CRIMINAL COMPLAINT

AO 91 (Rev. 11/82)

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>KEITH RALPH GARCIA | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>18MJ00002 |

Complaint for violation of Title 18, United States Code, § 2199

| NAME OF MAGISTRATE JUDGE<br>HONORABLE GAIL J. STANDISH | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATES OF OFFENSES<br>December 8, 2017 | PLACE OF OFFENSES<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT
JAN 2 2018
CENTRAL DISTRICT OF CALIFORNIA
BY         DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 2199]

On or about December 8, 2017, in Los Angeles County, within the Central District of California, defendant KEITH RALPH GARCIA knowingly boarded Turkish Airlines Flight No. TK 10 from Los Angeles to Istanbul, Turkey, without the consent of the owner, charterer, master, or person in command of the aircraft.

FILED
CLERK, U.S. DISTRICT COURT
JAN 2 2018
CENTRAL DISTRICT OF CALIFORNIA
BY         DEPUTY

2018 JAN -2 AM 10:4[?]
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

LODGED

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>DANA R. MURPHY<br>OFFICIAL TITLE<br>Special Agent – FBI |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<sup>(1)</sup> | DATE<br>January 2, 2018 |
|---|---|

<sup>(1)</sup> See Federal Rules of Criminal Procedure 3 and 54

AUSA KATHY YU, x. 2431      REC: Detention

## AFFIDAVIT

I, Dana R. Murphy, being duly sworn, declare and state as follows:

### PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for KEITH RALPH GARCIA ("GARCIA") for a violation of Title 18, United States Code, Section 2199 (Stowaways on Aircraft).

2. This affidavit is also made in support of an application for a warrant to search the digital devices seized from GARCIA on December 31, 2017 ("GARCIA'S DIGITAL DEVICES"), as described more fully in Attachment A, which is incorporated by reference, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2199 (Stowaways on Aircraft) and Title 49, United States Code, Section 46314 (Entering Aircraft or Airport Area In Violation of Security Requirements) (collectively, the "Target Offenses"), as described more fully in Attachment B, which is also incorporated by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## BACKGROUND FOR FBI SPECIAL AGENT DANA R. MURPHY

4. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately one year. I am currently assigned to the Los Angeles International Airport ("LAX") Office of the FBI, where I investigate violations of federal law which occur within the airport environment and on board aircraft.

5. My experience includes interviewing victims, subjects, and witnesses, gathering documents, analyzing video footage, assisting with the execution of search warrants, assisting with the execution of arrest warrants, conducting surveillance, and serving grand jury subpoenas. I also received training in complex investigations while attending the FBI Special Agent Academy in Quantico, Virginia. I have also received on the job training regarding stowaway cases from other more experienced agents on my team who have investigated such cases.

## SUMMARY OF PROBABLE CAUSE

6. On December 8, 2017, GARCIA boarded Turkish Airlines Flight No. TK 10 from Los Angeles to Istanbul, Turkey, without the consent of the owner, charterer, master, or person in command of the aircraft. Because GARCIA was not a ticketed passenger and did not otherwise have permission from Turkish Airlines to board Flight No. TK 10, when Turkish Airlines flight attendants discovered GARCIA's presence on the flight, the airplane had to be rerouted to Remote Gate 209.

Instrumentality Protocol

7. On December 31, 2017, GARCIA was once again at LAX, going up to the TSA screening level. At the time of his arrest, law enforcement found the GARCIA DIGITAL DEVICES.

## STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, my discussions with law enforcement agents and officers involved in the investigation, and my own observations and knowledge of the investigation, I am aware of the following:

### A. GARCIA Illegally Boards Flight No. TK 10

9. On December 8, 2017, FBI SA Wess T. Brooker informed me that GARCIA had boarded Turkish Airlines Flight No. TK 10, scheduled to depart Los Angeles for Istanbul, Turkey, but did not have a ticket. SA Brooker told me that the flight did not take off, but instead was redirected to Remote Gate 209.

10. On December 8, 2017, SA Brooker interviewed Mitra Tarkhasi ("Tarkhasi"), a Business Manager for Turkish Airlines. I learned from SA Brooker the following:

    a. On December 8, 2017, Tarkhasi was working outbound Flight No. TK 10, which was departing from Tom Bradley International Terminal Gate 159. After the flight was completely loaded, the doors of the aircraft were closed, and the flight departed from Gate 159 and began taxiing to the runway.

    b. After the flight had left the gate, Tarkhasi received a message that Flight No. TK 10 was returning, and had been assigned to return to Remote Gate 209. The flight crew

told Tarkhasi that one of the passengers had decided he/she wanted to get off of the flight.

    c.    Tarkhasi learned from on-board flight crew members that that the passenger who wanted to deplane was GARCIA in seat 40A. Tarkhasi and the ground crew then looked at the manifest for Flight No. TK 10, but GARCIA was not listed anywhere on the manifest. When they checked the manifest for seat 40A, they saw that the seat was not assigned to GARCIA, or to any other passenger.

    d.    Tarkhasi went to Remote Gate 209 and met the aircraft when the doors opened. Tarkhasi asked GARCIA for an identification card or driver's license. When GARCIA reached into his pocket, Tarkhasi saw that GARCIA'S pocket was full of boarding passes for various other airlines, including United Airlines. GARCIA was also carrying a large black canvas duffel bag.

    e.    Based on seeing GARCIA with numerous paper boarding passes in his pocket, a member of the ground crew contacted United Airlines to determine if GARCIA was a passenger with a planned itinerary on United Airlines who had somehow ended up in the wrong boarding area. A United Airlines representative confirmed that they did not have any record of GARCIA on any United Airlines flights.

    f.    The ground crew then checked the contents of GARCIA's large black canvas duffel bag. Within the duffel bag, they found multiple small plastic bags with folded magazines, pictures, printouts, two identification cards in names other

Instrumentality Protocol

than GARCIA, and other pieces of paper. Tarkhasi saw that one bag was full of boarding passes and receipts. Along with a colleague, Tarkhasi checked all of the names on the boarding passes in the bag and saw that none of the boarding passes had GARCIA's name.

       g.    When a member of the flight crew handed back these boarding passes to GARCIA, GARCIA began to rip the boarding passes, as if he was trying to destroy or hide them, so Tarkhasi took the boarding passes away from GARCIA.

       h.    Turkish Airlines then contacted Customs and Border Protection ("CBP") to report the incident relating to GARCIA. However, before CBP officers could respond to Remote Gate 209, GARCIA left the area. Tarkhasi explained that GARCIA exited the gate area and walked out onto the airfield. Tarkhasi heard later from an LAX police officer that GARCIA had boarded a transportation bus for a different airline.

    B.    **Review of LAX Surveillance Video**

    11.    To better understand how GARCIA was able to get on Flight No. TK 10 without a valid boarding pass, the FBI obtained LAX security surveillance video from December 8, 2017.

    12.    On December 12, 2017, I reviewed the security camera video of Gate 159 from the evening of December 8, 2017. From my review of the video, I learned the following:

Instrumentality Protocol

a. Turkish Airlines employee Rana Hammed Aslam[1] was at the gate scanning boarding passes for passengers boarding Flight No. TK 10.

b. I saw GARCIA standing to one side of Aslam, and he appeared to be talking on his cellphone. Then, when Aslam turned to scan the boarding pass of a female passenger with a red coat, GARCIA walked behind Aslam's back, passed the boarding pass scanning stations without presenting a boarding pass, and entered the hallway to the jet bridge.

c. Immediately after entering the hallway, GARCIA appeared to have a brief conversation with Turkish Airlines employee Behnam Sadraei, and then proceeded towards the jet bridge to board Flight No. TK 10.

C. **GARCIA Is Found Again at LAX**

13. As a result of GARCIA's actions on December 8, 2017, a Be On the Lookout ("BOLO") featuring a photograph and description of GARCIA was issued for law enforcement partners at LAX.

14. On December 31, 2017, at approximately 3:00 p.m., LAX Police Officer Michael Law saw someone matching the description of GARCIA that was in the BOLO.

15. Officer Law and other officers then followed GARCIA as he moved up an escalator to the TSA screening level.

16. Officer Law and Office Ngna Lee asked GARCIA for his identification, and based on the identification provided by

---

[1] Turkish Airlines employees Mitra Tarkhasi and Ozlem Giroux helped me identify the Turkish Airline employees in the video.

Instrumentality Protocol

GARCIA, was able to confirm that he was the same GARCIA in the BOLO.

17. Officer Lee and Officer Takeshi Komiyama conducted a search of GARCIA's person and black duffel bag. Officers located the following:

    a. A black LG phone, model number LG-TP450, in the chest pocket of GARCIA's jacket; and

    b. A True 3G, Super Hero model, in a black satchel inside GARCIA's black duffel bag.

### D. Investigation of GARCIA is Ongoing

18. On December 31, 2017, I learned from LAX Police and other law enforcement agents that previously, on or about December 16, 2017, December 17, 2017, and December 29, 2017, GARCIA was seen at LAX again.

19. Based on our investigation so far, GARCIA did not have any incoming or outgoing flights on those dates either.

### TRAINING AND EXPERIENCE REGARDING THE TARGET OFFENSES

20. Based on my knowledge, training, and experience, as well as information related to me by other agents, TSA requires a passenger to present a valid photo identification to match a valid boarding pass. A valid boarding pass can either be paper or digital (as in, a barcode or other airline-issued identifier on a phone that is capable of scanning). For digital boarding passes, I also know that once a digital boarding pass has been used at a TSA screening checkpoint, it may not be automatically deleted from the digital device. Therefore, expired digital boarding passes could remain on a digital device for years.

21. Based on my knowledge, training, experience, as well as information related to me by other agents, many airlines allow passengers to "check in" for their flights through web browsers or airline-specific applications. These airline-specific applications allow users to check in, book, change, or cancel air reservations, access their digital boarding passes, and review their past itineraries. These airline-specific applications also allow users to take photos of their itineraries and boarding passes, and to send them to others.

22. Based on my knowledge, training, and experience, as well as information related to me by other agents, individuals who attempt to evade security requirements tend to possess documents and records reflecting their fraudulent activities, including personal information of others, previous attempts to evade security, and notes regarding airline and TSA practices. Such documents and records tend to be preserved in electronic form on digital devices.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

   a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital

devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

  b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

  c. The amount of storage space on GARCIA'S DIGITAL DEVICE is currently unknown. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

  d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted,

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

Instrumentality Protocol

they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, *i.e.*, space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

   e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.

Instrumentality Protocol

In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

Instrumentality Protocol

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image

file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

24. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## CONCLUSION

25. For all the reasons described above, there is probable cause to believe that GARCIA has committed a violation of Title 18, United States Code, § 2199.

26. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses will be found on the digital devices described in Attachment A.

_____
Dana R. Murphy
Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me this ___ day of January 2018.

_____
HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE